Trenton R. Kashima (No. 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
402 W. Broadway, STE 1760
San Diego, CA 92101-8546
Tel: 619-810-7047
tkashima@brysonpllc.com

***Attorneys for Plaintiffs and the Class***

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIM MILSTEAD and MITCHELL SZYDLOWSKI, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| FARMERS INSURANCE EXCHANGE; FARMERS GROUP, INC.; FARMERS NEW WORLD LIFE INSURANCE COMPANY, | |
| Defendants. | |

Plaintiffs Jim Milstead and Mitchell Szydlowski ("Plaintiffs"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to them and upon information and belief as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against Defendants Farmers Insurance Exchange ("Defendant FIE"), Farmers Group, Inc. ("Defendant FGI"), and Farmers New World Life Insurance Company ("Defendant New World", and collectively with Defendant FIE and Defendant FGI, "Farmers" or "Defendants"), and allege as follows:

## I. **INTRODUCTION**

1.      Plaintiffs bring this action on behalf of themselves, and all other individuals similarly situated ("Class Members") against Farmers for their failure to secure and safeguard the personally identifiable information ("PII") and/or private health information ("PHI") (collectively, "Private Information") of Plaintiffs and Class Members.

2.      Farmers are for-profit companies providing insurance to clients nationwide.

3.      Defendant FIE is incorporated in the state of California and maintains its principal place of business in Woodland Hills, CA. In the regular course of its business, Defendant FIE is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their clients' Private Information against unauthorized access and disclosure. Defendant FIE's clients, including Plaintiffs and Class Members, entrusted their PII and PHI to Defendant FIE.

4.      Defendant FGI is incorporated in the state of Nevada and maintains its principal place of business in Woodland Hills, CA. In the regular course of its business, Defendant FGI is required to maintain reasonable and adequate security

CLASS ACTION COMPLAINT

measures to secure, protect, and safeguard their clients' Private Information against unauthorized access and disclosure. Defendant FGI's clients, including Plaintiffs and Class Members, entrusted their PII and PHI to Defendant FGI.

5. Defendant New World is incorporated in the state of Washington and maintains its principal place of business in Bellevue, Washington. In the regular course of its business, Defendant New World is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their clients' Private Information against unauthorized access and disclosure. Defendant New World's clients, including Plaintiffs and Class Members, entrusted their PII and PHI to Defendant New World.

6. On approximately May 29, 2025, an unauthorized third party gained access to Farmers' network systems and accessed the Farmers databases (the "Data Breach"). This Data Breach put Plaintiffs' and Class Members' names, social security numbers, dates of birth, addresses, policy numbers, financial information, and other PII and PHI at risk of exposure.

7. Farmers owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure. Farmers breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect clients' Private Information from unauthorized access and disclosure.

8. Every year, millions of Americans have their most valuable PII and/or PHI stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

9.      Farmers required its clients to provide it with sensitive Private Information and failed to protect that Private Information. Farmers had an obligation to secure clients' Private Information by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Farmers and its clients, and Plaintiffs and Class Members were third-party beneficiaries of that agreement.

10.     As a result of Farmers' failure to provide reasonable and adequate data security, Plaintiffs' and Class Members' unencrypted, non-redacted Private Information has been exposed to unauthorized third parties. Plaintiffs and Class Members are now at a much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive Private Information stolen here and the fact that the compromised Private Information is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiffs and Class Members as they no longer have control over their Private Information, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

11.     Plaintiffs and the Class will incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

12.     Plaintiffs bring this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Farmers to ensure that it implements and maintains reasonable data security

CLASS ACTION COMPLAINT

practices going forward.

## II. THE PARTIES

13.    Plaintiff Jim Milstead is an individual residing in Oxnard, California.

14.    Plaintiff Mitchel Szydlowski is an individual residing in Corpus Christi, Texas.

15.    Defendant FIE is a California corporation, with its headquarters and principal place of business located at 6301 Owensmouth Avenue, Woodland Hills, CA 91367.

16.    Defendant FGI is a Nevada corporation, with its headquarters and principal place of business located at 6301 Owensmouth Avenue, Woodland Hills, CA 91367.

17.    Defendant New World is a Washington corporation, with its headquarters and principal place of business located at 3120 139th Ave. SE, Suite 300, Bellevue, Washington 98005.

## III.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), because there are more than 100 Class Members, at least one class member, including Plaintiffs, is a citizen of a state different from that of Farmers, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

19.    This Court has personal jurisdiction over Defendant FIE because it maintains its principal place of business in California and transacts business in California. This Court has personal jurisdiction over Defendant FGI because it maintains its principal place of business in California and transacts business in California. This Court has personal jurisdiction over Defendant New World because it transacts business in California.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because two of the defendants have their principal place of business in this District, all three defendants transact business in this district, and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## IV.    GENERAL ALLEGATIONS COMMON TO ALL COUNTS

21.    This is a class action brought by Plaintiffs, individually and on behalf of all individuals who are similarly situated (i.e., the Class Members), seeking to redress Farmers' willful and reckless violations of their privacy rights. Plaintiffs and Class Members were clients of Farmers.

22.    On approximately May 29, 2025, an unauthorized third party accessed and downloaded Plaintiffs' and Class Members' Private Information.

23.    This action pertains to Farmers' unauthorized disclosures of the Plaintiffs' Private Information that occurred on or around May 29, 2025.

24.    Farmers disclosed Plaintiffs' and Class Members' Private Information to unauthorized persons as a direct and/or proximate result of Farmers' failure to safeguard and protect Plaintiffs and Class Members' Private Information.

25.    By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Farmers assumed legal and equitable duties and knew or should have known it was responsible for protecting the Private Information from unauthorized disclosures.

26.    Despite recognizing its duty to do so, Farmers failed to implement security safeguards to protect Plaintiffs' and Class Members' Private Information.

27.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on their insurance

providers, like Farmers, to keep their Private Information confidential and securely maintained, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

## 1.    The Data Breach

28.    According to a data breach notice ("Breach Notice") sent by Farmers to their clients on August 22, 2025, Farmers discovered unauthorized access to their network systems that occurred on approximately May 29, 2025. During this time, and based on Farmers's data breach notices filed with state agencies, an unauthorized third party accessed client email accounts containing Private Information of clients. The Private Information at risk of exposure as a result of this Data Breach includes clients' names, addresses, policy numbers, social security numbers, dates of birth, and other financial information.

29.    Farmers first identified suspicious activity within their networks on or about May 30, 2025, allegedly resulting in an immediate investigation. Farmers subsequently determined that certain files related to clients had been accessed and copied by an unauthorized actor. Beginning August 22, 2025, Farmers began notifying their clients about which individuals and specific data may have been involved in the Data Breach.

30.    The Breach Notice posted by Farmers did not specify detailed measures or actions taken by Farmers to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

## 2.    The Data Breach was Preventable

31.    Had Farmers maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Farmers could have safeguarded client data. Farmers' lack of security controls and implementation of

CLASS ACTION COMPLAINT

enhanced security measures only after the Data Breach are inexcusable.

32.     Farmers were at all times fully aware of its obligation to protect clients' Private Information and the risks associated with failing to do so. Farmers knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

33.     This exposure, along with the fact that the compromised Private Information is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



34.     By 2013, it was reported that nearly one out of four data breach notification recipients become a victim of identity fraud.

35.     Stolen PII is often trafficked on the dark web. Law enforcement has difficulty policing the dark web due to its encryption, which allows users and criminals to conceal identities and online activity.

36.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.

CLASS ACTION COMPLAINT

37.    In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."

38.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."

39.    In May 2023, MCNA Insurance Company disclosed that the "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code . . . According to MCNA, the hackers were successful in accessing patient personal information."

40.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year" that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."

41.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published an online "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include

CLASS ACTION COMPLAINT

pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."

42.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."

43.    The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200. Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web. Criminals can also purchase access to entire company data breaches from $900 to $4,500.

44.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

illegally using your Social Security number assuming your identity can cause a lot of problems.

45.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

46.    Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

47.    Because of this, the information compromised in the Data Breach here is significantly more harmful than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

48.    The PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth 10 times more on the black market."

49.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

50.    According to the FBI's Internet Crime Complaint Center (IC3) 2019

CLASS ACTION COMPLAINT

Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

51.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and can experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

52.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

53.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name. The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and it can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

54.    The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, which is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

**3.    Farmers Failed to Comply with Federal Trade Commission Guidelines**

55.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to

individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

56.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines based on fundamental data security principals for business. Among other things, the guideline notes businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

57.    Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

58.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data

security obligations.

### 4.    The Impact of Data Breach on Victims

59.    Farmers' failure to keep Plaintiffs' and Class Members' Private Information secure has severe ramifications. Given the highly sensitive nature of the Private Information stolen in the Data Breach, which includes Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and in the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

60.    The Private Information exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the Private Information to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

61.    Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

62.    Given the confirmed exfiltration of client Private Information from Farmers, many victims of the Data Breach have likely already experienced

13

significant harms as a result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

63.    It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.

64.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack or focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.

65.    Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

CLASS ACTION COMPLAINT

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

66.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.

67.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

68.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.   The unconsented disclosure of confidential information to a third party;

b.   Unauthorized use of their Private Information without compensation;

c.   Losing the value of the explicit and implicit promises of data security;

d.   Losing the value of access to their Private Information, which Farmers permitted without their permission;

e.  Identity theft and fraud resulting from the theft of their Private Information;

f.  Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.  Anxiety, emotional distress, and loss of privacy;

h.  The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.  Unauthorized charges and loss of use of and access to their accounts;

j.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.  Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.  The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being in the possession of one or more unauthorized third parties.

69.  Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to

identity theft or fraud.

70. Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.

71. Plaintiffs and Class Members have a direct interest in Farmers' promises and duties to protect Private Information, i.e., that Farmers would *not increase* their risk of identity theft and fraud. Because Farmers failed to live up to their promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and continuing increased risk of harm caused by Farmers' wrongful conduct. Through this remedy, Plaintiffs seek to restore themself and Class Members to as close to the same position as they would have occupied but for Farmers' wrongful conduct, namely their failure to adequately protect Plaintiffs' and Class Members' Private Information.

72. Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their Private Information permitted through Farmers' wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use of or access to a person's PII is non-rivalrous. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the

owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

73.    Plaintiffs and Class Members have an interest in ensuring that their Private Information is secure and not subject to further theft because Farmers continues to hold their Private Information.

**Plaintiffs' Experience**

74.    Plaintiff Jim Milstead had an automobile insurance policy with Farmers.

75.    On May 29, 2025, Farmers experienced a Data Breach, and as a result, Plaintiff Jim Milstead's Private Information was, upon information and belief, accessed by an unauthorized third party.

76.    The Data Breach that compromised Plaintiff Jim Milstead's Private Information was preventable and occurred as a result of the failure of Farmers to employ adequate and standard data security measures.

77.    Due to the Data Breach, and Farmers' failure to prevent it, Plaintiff Jim Milstead is at increased risk of becoming a victim of identity theft and fraud.

78.    Plaintiff Mitchell Szydlowski has an automobile insurance policy and a homeowners insurance policy with Farmers.

79.    On May 29, 2025, Farmers experienced a Data Breach, and as a result, Plaintiff Mitchell Szydlowski's Private Information was, upon information and belief, accessed by an unauthorized third party.

80.     The Data Breach that compromised Plaintiff Mitchell Szydlowski's Private Information was preventable, and occurred as a result of the failure of Farmers to employ adequate and standard data security measures

81.     Due to the Data Breach, and Farmers' failure to prevent it, Plaintiff Mitchell Szydlowski is at increased risk of becoming a victim of identity theft and fraud.

## V. <u>CLASS ACTION ALLEGATIONS</u>

82.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed classes, defined as follows:

### <u>Nationwide Class</u>
All persons residing in the United States whose personally identifiable information or personal health information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

### <u>California Subclass</u>
All members of the Nationwide Class who resided in California as of May 29, 2025.

83.     Excluded from the Nationwide Class and the California Subclass are any officer or director of Farmers; any officer or director of any affiliate, parent, or subsidiary of Farmers; anyone employed by counsel in this action; and any judge to whom this case is assigned, their spouse, and members of the judge's staff.

84.     **Numerosity.** Members of the proposed Nationwide Class and the California Subclass are likely too numerous to practically join in a single action. Membership in the Nationwide Class and the California Subclass is readily ascertainable from Farmers' own records.

85.     **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members (of both classes, which are discussed collectively herein unless noted otherwise) and predominate over questions affecting

19

only individual Class Members. These common questions include:

      a.    Whether Farmers engaged in the wrongful conduct alleged herein;

      b.    Whether Farmers' inadequate data security measures were a cause of the Data Breach;

      c.    Whether Farmers owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

      d.    Whether Farmers negligently or recklessly breached legal duties owed to Plaintiffs and Class Members to exercise due care in collecting, storing, and safeguarding their PII and/or PHI;

      e.    Whether Plaintiffs and Class Members are at an increased risk for identity theft because of the Data Breach;

      f.    Whether Farmers failed to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class Members' PII in violation of Section 5 of the FTC Act;

      g.    Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

86.    Farmers engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

87.    **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Nationwide Class and the California Subclass. All Class Members were subject to the Data Breach and had their PII or PHI accessed by and/or disclosed to

unauthorized third parties. Farmers' misconduct affected all Class Members in the same manner.

88.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Nationwide Class and the California Subclass because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Nationwide Class and the California Subclass will be fairly and adequately protected by Plaintiffs and their counsel.

89.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damage, harm, or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Farmers, making it impracticable for Class Members to individually seek redress for Farmers' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
## BREACH OF CONTRACT

(on behalf of the Plaintiffs and the Nationwide Class)

90.    Plaintiffs reallege and incorporate paragraphs 1 through 89 as if fully set forth herein.

91.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class, the members of which are referred to herein as the "National Class Members."

92.    Plaintiffs and National Class Members contracted with Farmers for the latter to provide insurance. It is because of the contracts between Plaintiffs and the National Class Members and Farmers that Farmers came to possess the Private Information of Plaintiffs and the National Class Members.

93.    Pursuant to these contracts, the Plaintiffs and National Class Members paid money to Farmers and provided Farmers with their Private Information. In exchange, Farmers agreed to, among other things: (1) provide insurance-related services relating to Plaintiffs and National Class Members; (2) use Plaintiffs' and National Class Members' Private Information to facilitate providing insurance-related services involving Plaintiffs and National Class Members; (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and National Class Members' Private Information; and (4) protect Plaintiffs' and National Class Members' Private Information in compliance with federal and state laws and regulations, industry standards, and Farmers' representations regarding its security and privacy practices.

94.    The protection of Private Information was a material term of the contracts between Plaintiffs and Farmers. Had Plaintiffs and National Class Members known that Farmers would not adequately protect their Private Information, they would not have paid for or obtained insurance or related services from Farmers.

95.    Farmers breached their obligations under the contracts with Plaintiffs and the National Class Members in failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and National Class Members' Private Information, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and National Class Members' Private Information

CLASS ACTION COMPLAINT

in a manner that complies with applicable laws, regulations, and industry standards.

96.    Farmers' breach of their obligations with Plaintiffs and National Class Members directly resulted in the Data Breach and the resulting injuries to Plaintiffs and National Class Members.

97.    Plaintiffs and National Class Members were damaged by Farmers' breach of contract because: (i) they now face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their Private Information was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; and (v) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT II

## NEGLIGENCE

(On behalf of the Plaintiffs and the Nationwide Class)

98.    Plaintiffs reallege and incorporate paragraphs 1 through 89 as if fully set forth herein.

99.    Plaintiffs bring this claim individually and on behalf of the National Class.

100.    Farmers owed a duty to Plaintiffs and National Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and National Class Members' Private Information from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing their data security systems to ensure that Plaintiffs' and National Class Members' Private Information

in Farmers' possession was adequately secured and protected.

101.    Farmers owed, and continue to owe, a duty to Plaintiffs and National Class Members to safeguard and protect their Private Information.

102.    Farmers breached their duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and National Class Members' Private Information.

103.    It was reasonably foreseeable that Farmers' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and National Class Members' Private Information would result in an unauthorized third-party gaining access to such information for no lawful purpose.

104.    As a direct result of Farmers' breach of their duty of confidentiality and privacy and the disclosure of Plaintiffs' and National Class Members' confidential information, Plaintiffs and the National Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life.

105.    By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Farmers' systems containing the Private Information at issue, Farmers failed to meet the data security standards as set forth under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Farmers has failed to do as discussed herein.

106.    Farmers' failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

107.    Neither Plaintiffs nor other National Class Members contributed to the Data Breach as described in this Complaint.

108.   Farmers' wrongful actions and/or inaction and the resulting Data Breach (as described above) constitutes negligence at common law.

109.   As a result of Farmers' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and National Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Farmers' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III

## BREACH OF FIDUCIARY DUTY

(On behalf of the Plaintiffs and the Nationwide Class)

110.   Plaintiffs reallege and incorporate paragraphs 1 through 89 as if fully set forth herein.

111.   Plaintiffs bring this claim individually and on behalf of the National Class.

112.   Plaintiffs and National Class Members gave Farmers their Private Information in confidence, believing that Farmers would protect that information. Plaintiffs and National Class Members would not have provided their Private Information had they known it would not be adequately protected. Farmers' acceptance, use, and storage of Plaintiffs' and National Class Members' Private

Information created a fiduciary relationship between Farmers and Plaintiffs and National Class Members. In light of this relationship, Farmers must act primarily for the benefit of Plaintiffs and National Class Members, which includes safeguarding and protecting Plaintiffs' and National Class Members' Private Information.

113.    Farmers have a fiduciary duty to act for the benefit of Plaintiffs and National Class Members upon matters within the scope of their relationship. They breached that duty by, among other things, failing to, or contracting with third parties that failed to, properly protect the integrity of the system containing Plaintiffs' and National Class Members' Private Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and National Class Members' Private Information that it collected, utilized, and maintained.

114.    As a direct and proximate result of Farmers' breach of their fiduciary duties, Plaintiffs and National Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Farmers' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV

## UNJUST ENRICHMENT

(On behalf of the Plaintiffs and the Nationwide Class)

CLASS ACTION COMPLAINT

115.    Plaintiffs reallege and incorporate paragraphs 1 through 89 as if fully set forth herein.

116.    This claim is pleaded in the alternative to the breach of contract claim.

117.    Plaintiffs bring this claim individually and on behalf of the National Class.

118.    Plaintiffs and National Class Members conferred a monetary benefit upon Farmers in the form of Private Information transferred to Farmers.

119.    Farmers accepted or had knowledge of the benefits conferred upon them by Plaintiffs and National Class Members. Farmers benefitted from the receipt of Plaintiffs' and National Class Members' Private Information, as this was used to facilitate billing and payment services and other aspects of Farmers' business as insurance providers.

120.    As a result of Farmers' conduct, Plaintiffs and National Class Members suffered actual damages.

121.    Farmers should not be permitted to retain funds paid to them for services related to the PII and/or PHI of Plaintiffs and National Class Members given that Farmers failed to adequately implement the data privacy and security procedures that would have safeguarded the Private Information of Plaintiffs and National Class Members.

122.    Farmers should be compelled to provide for the benefit of Plaintiffs and National Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT V

## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA)

**(Cal. Civ. Code. Sec. 1798.100, et seq,)**

(on behalf of Plaintiff Jim Milstead and the California subclass)

CLASS ACTION COMPLAINT

123.    Plaintiff Jim Milstead realleges and incorporates paragraphs 1 through 89 as if fully set forth herein.

124.    At all relevant times, each defendant was a "business" as defined in Cal. Civ. Code § 1798.140(c), and Plaintiff Jim Milstead and the California Subclass Members were "consumers" as defined in Cal. Civ. Code § 1798.140(g).

125.    The PII and/or PHI collected and stored by Farmers constitutes "personal information" as defined in Cal. Civ. Code. Sec. 1798.81.5, including but not limited to names and driver's license numbers.

126.    The CCPA, Cal. Civ. Code § 1798.150(a), provides a private right of action for any consumer whose nonencrypted or nonredacted personal information is subject to unauthorized access and exfiltration, theft, or disclosure as a result of a business's violation of its duty to implement and maintain reasonable security procedures and practices.

127.    Farmers failed to implement and maintain reasonable security practices and procedures appropriate for the personal information to protect it from unauthorized access, exfiltration, and disclosure, in violation of Cal. Civ. Code § 1798.150(a).

128.    As a direct and proximate result of Farmers's violations of the CCPA, the personal information of Plaintiff Jim Milstead and the California Subclass Members was compromised in the Data Breach.

129.    Concurrently with the filing of this complaint, Plaintiff Jim Milstead is serving Farers with the notice required by Cal. Civ. Code § 1798.150(b) and will amend this complaint to allege a claim for statutory damages when the 30-day notice period expires. Presently, Plaintiff Jim Milstead seeks injunctive relief to ensure Farmers implement and maintain reasonable security procedures to protect the private information of the California Subclass Members.

**COUNT VI**

**VIOLATION OF THE CALIFORNIA CUSTOMER RECORDS ACT**

**(Cal. Civ. Code. Sec. 1798.80, et seq.)**

(on behalf of Plaintiff Jim Milstead and the California Subclass)

130.   Plaintiff Jim Milstead realleges and incorporates paragraphs 1 through 89 as if fully set forth herein.

131.   At all relevant times, each defendant was a "business" that owns or licenses computerized data that includes personal information, as defined by Cal. Civ. Code § 1798.81.5(d)(1). The Private Information at issue here includes "personal information" as defined in Cal. Civ. Code § 1798.80(e).

132.   The California Customer Records Act ("CRA") requires businesses to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect it from unauthorized access, destruction, use, modification, or disclosure. Cal. Civ. Code § 1798.81.5(b).

133.   Farmers failed to implement and maintain such reasonable security procedures and practices. As a result of Farmers's violation of § 1798.81.5, Plaintiff Jim Milstead's and the California Subclass Members' personal information was stolen by cybercriminals/hackers.

134.   The CRA requires that any business that maintains personal information that has been subject to a security breach must disclose the breach in the most expedient time possible and without unreasonable delay. Cal. Civ. Code § 1798.82(a). Farmers failed to disclose the Data Breach to Plaintiff Jim Milstead and the California Subclass Members without unreasonable delay, waiting months after discovery of the Data Breach to begin notifying impacted individuals.

135.   As a direct and proximate result of Farmers's violations of the CRA, Plaintiff Jim Milstead and the California Subclass Members have suffered damages as alleged herein and seek all remedies available under Cal. Civ. Code §§

1798.84(b), including compensatory damages, injunctive relief, and attorneys' fees and costs.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the California Subclass proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Farmers, as follows:

A.  Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives of the Nationwide Class and Plaintiff Jim Milstead as representative of the California Subclass and appointing Plaintiffs' counsel as Lead Counsel for the Nationwide Class and the California Subclass;

B.  Awarding Plaintiffs and the Class Members appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.  Awarding Plaintiffs and the Class Members equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class Members, seek appropriate injunctive relief designed to prevent Farmers from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.  Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

E.  Awarding Plaintiffs and the Class Members reasonable attorneys'

CLASS ACTION COMPLAINT

1    fees, costs, and expenses, as allowable; and

2    F.    Awarding Plaintiffs and the Class Members such other favorable

3    relief as allowable under law.

4

5    **<u>JURY DEMAND</u>**

6    Plaintiff requests a trial by jury of all claims so triable.

7

8    Dated: August 26, 2025    **BRYSON HARRIS SUCIU & DeMAY PLLC**

9

10    */s/ Trenton R. Kashima*

11    Trenton R Kashima (SBN 291405)
      402 W. Broadway, STE 1760
12    San Diego, CA 92101-8546
      Tel: 619-810-7047
13    tkashima@brysonpllc.com

14    *Attorneys for Plaintiffs and the Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT